37 C.C.P.A. (Patents)

### Application of WIEGAND et al.
### Patent Appeal No. 5630.

United States Court of Customs
and Patent Appeals.

Argued Nov. 10, 1949.

Decided April 3, 1950.

Rehearing Denied June 28, 1950.

Pennie, Edmonds, Morton & Barrows, New York City (Dean S. Edmonds, S. Howell Brown, Jr., New York City, and Clarence M. Fisher, Washington, D. C., of counsel) for appellants.

E. L. Reynolds, Washington, D. C. (Clarence W. Moore, Washington, D. C., of counsel) for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL and JOHNSON, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office upholding that of the Primary Examiner rejecting the three claims (the only claims in the case) numbered 19, 20, and 21 of appellants' application, serial No. 448,806, broadly entitled "Carbon Black," filed June 27, 1942, as a continuation of applicants' co-pending application, serial No. 349,908, filed August 2, 1940.

The claims read as follows:

"19. A furnace carbon black comprising not less than 97% fixed carbon and having a surface area within the range extending from 7.5 to 10 acres per pound.

"20. A furnace carbon black comprising not less than 97% fixed carbon, having a color approximating that of 'standard rubber grade impingement' carbon black,' a surface area within the range extending from 7.5 to 10 acres per pound, oil absorption characteristics within the range of about 85 to 125 gallons per 100 pounds of carbon black, a pH not less than about 7 and a tinctorial strength at least 90% that of 'standard rubber grade impingement carbon black' in conjunction with a relatively blue undertone.

"21. A furnace carbon black comprising not less than 97% fixed carbon, having a color approximating that of 'standard rubber grade impingement carbon black,' a surface area within the range extending from 7.5 to 10 acres per pound, oil absorption characteristics within the range of about 85 to 125 gallons per 100 pounds of carbon black, a pH not less than about 7, and a tinctorial strength at least 90% that of 'standard rubber grade impingement carbon black,' in conjunction with a relatively blue undertone, and rubber compounding characteristics such that in 'vulcanized standard tire tread compound' it exhibits in conjunction a tensile strength within the range of about 3800 to about 4200 pounds per square inch, a rebound of about seven-tenths, an energy of rupture within the range of about 800 to about 1000 pounds per cubic inch, a Log R electrical resistivity not in excess of about 4, and ageing characteristics superior to those of 'standard rubber grade impingement carbon black' in 'standard tire tread compound.' "

It will be noted that all are product claims. Patent for a method appears to have been granted in a divisional application. No question of double patenting is involved.

It appears that carbon black is used in the making of inks, paints, lacquers and the like, but that its greatest use is in articles made of rubber, particularly automobile

tires. The brief for appellants states that "In that [automobile tire] field, it is known as a 'reinforcing agent', and is used to the extent of millions of pounds per year."

The brief also states: "The carbon blacks now used in industry are (1) impingement or channel black, (2) furnace black, (3) thermal decomposition black, (4) acetylene black and (5) lamp black."

The method of producing each of the foregoing types or kinds of carbon black is set forth in the brief, and it is said (page references to the record being omitted):

"Thermal decomposition black, acetylene black and lamp black are made in what might be considered a furnace and for that reason alone they might superficially be called furnace blacks. However, as the term is used in the present specification, thermal decomposition black, acetylene black and lamp black are not classified as furnace blacks * * *.

"The foregoing brief exposition of the kinds of carbon black heretofore available and the uses to which they have been put suffices to show that these blacks differ widely one from another, so much so that some are not used at all in rubber compounding. To the eye, they are all the same. With the finest instrumentalities now available, the differences of structure between them can be determined to only a limited degree. But important differences do exist. They must exist because of differences of great moment in products made with the different blacks. A consequence of this condition is that it is not possible to go as far as might be desired in defining a new carbon black by its physical properties alone. Beyond that, one must resort, for purposes of definition, to the *results* flowing from the use of the new black, such as the properties of a rubber product made with the black. That is what the art has done heretofore * * * and it has been done in this instance because no better form of definition is available. Also, it is in accordance with the comment of the Supreme Court in General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364 [58 S.Ct. 899, 82 L.Ed. 1402], more particularly on page 368, wherein the claims under consideration were, quite obviously as it seems to us, insufficiently definitive of the claimed new product." (Italics quoted)

The brief then states:

"In the three claims before the court, the product is defined as 'a furnace black' and that is intended to exclude from the scope of the claims all channel blacks, thermal decomposition blacks, acetylene blacks and lamp blacks.

"This furnace black is further defined in the three claims by reference to its mean particle size. This item of mean particle size is commonly defined in terms of the aggregate surface area of a unit weight of the black, such as a number of acres per pound * * *. Channel black, as now and heretofore made, has a surface area on this basis of 10.6 to 22.2 acres per pound. Furnace blacks as made prior to this invention were of a surface area not exceeding 3 to 4 acres per pound * * *

"A distinctive feature of the product of these claims is a furnace black of an extremely fine particle size, a mean particle size represented by an aggregate surface area of 7.5 to 10 acres per pound. Such a carbon black of the furnace type or any other type, had never been produced prior to this invention. And such a carbon black has utilities extending beyond those of any prior form of carbon black. It may be and is being used for making tread stock for automobile tires. That is a use for which the prior furnace blacks were not adapted and in that use this new black presents advantages even over the channel black which the art had commonly used * * *."

In his statement following the appeal to the board the Primary Examiner cited as references eight publications and seven patents and discussed them in connection with his reasons for rejection. Some of those references had not been mentioned in the decisions of the Primary Examiner—not even in his decision of January 18, 1946, which was declared to be his final decision. So, appellants had had no opportunity to meet or discuss the Primary Examiner's view of the applicability of the newly cited references during the prosecution of their application before him.

The Primary Examiner apparently recognized the situation which had resulted from his failure to cite those references in his prior rulings because, in his statement, he said:

"While the reasons for rejection have been expanded and publications or patents referred to in this action have not heretofore been made of record, the situation is not one where prosecution before the examiner can be reopened under ex parte Mevey, 1891 C.D. 115. This does not preclude presentation of further proof or amendment at a reasonable time prior to hearing, which the Board of Appeals may remand to the examiner."

As we interpret the immediately foregoing quoted matter, it was virtually (1) a suggestion that appellants present further proof or amendment and (2) a request that the board remand the matter of the Primary Examiner for reconsideration.

Whatever may be the proper interpretation, the fact is that appellants did file a petition for remand accompanying it with proposed amendments to the claims, and with affidavits, and the case was remanded.

In what is designated as "Supplemental Examiner's Statement," the proposed amendments to the claims were entered so that they read as quoted, *supra,* and the Primary Examiner's discussion of them is hereinafter referred to.

The Primary Examiner also discussed the new affidavits to some extent and made some corrections as to expressions in his original statement. He adhered, however, to his conclusion that all the claims should be rejected and did not withdraw any of the references cited in his original statement.

In the decision of the board all the references so cited are listed, but the board, while affirming the Primary Examiner's decision, expressly disagreed with certain of his grounds of rejection, and, in the light of the board's decision, we deem it unnecessary to our decision to repeat or consider all the references.

The brief of the Solicitor for the Patent Office points out that the board relied upon five distinct bases of rejection and, in our opinion, it is a fair construction of its decision that the other references cited in support of any other basis of rejection by the Primary Examiner were overruled by the rejection of any such ground or basis.

The solicitor's brief points out that the five distinct bases of rejection adopted by the board were:

" * * * Claims 19, 20, and 21, as a group, were rejected * * *:

"(1) As unpatentable * * * over the patent to Brownlee, No. 1,920,352 [for the product] * * * companion to Brownlee patent, No. 1,909,163 [for the process] * * *.

"(2) As unpatentable * * * over the patent to Reed, No. 2,163,630 * * *.

"(3) As unpatentable * * * over the patent to Keller, No. 1,999,541 * * *.

"Claim 19, singly, was rejected by the Board:

"(4) As unpatentably distinguishing * * *[1] from the 'acetylene black of the prior art.'

"(5) As unpatentable * * * over the patent to Spear et al., No. 1,987,644 * * *."[1]

Appellants' patent (stated by the Primary Examiner to be Patent No. 2,378,055) for the method of making their product is not embraced in the record filed with this court, but it is described in the statement of the Primary Examiner following the appeal to the board as follows:

"In the method disclosed an air-gas mixture is introduced at high velocity, and ig-

---

[1]. The Primary Examiner seemingly rejected claims 20 and 21 along with claim 19 upon this ground but the board held that their rejection upon that ground "cannot be sustained," saying, "we find the publications of record in this case as well as the properties for the prior art acetylene carbon black set out in appellants' application do not disclose acetylene black as having many of the properties set forth in the appealed claims." For similar reasons, the board refused to sustain the Primary Examiner's rejection of claims 20 and 21 on the patent to Spear et al. although sustaining his rejection on it of claim 19.

nited, at the inlet of a cylindrical retort of relatively small cross-section to give a violently turbulent flame and flow through the retort. A hydrocarbon gas to be decomposed is introduced also at high velocity at a point beyond the ignition point in the retort and at right angles thereto. The carbon produced is carried along by the gas flow, is immediately cooled, and recovered. As to the possible variations in this method the specification states:

" 'The properties of the carbon black resulting from the above described process may be varied somewhat within the range hereinafter indicated (a) by varying the relative amounts of air and gas in the blast mixture; (b) by varying the relative amounts of make and blast gases; (c) by varying somewhat the temperature and temperature gradient in the retort; (d) by varying the time at which the carbon black particles are in contact with the gases at high reactive temperatures; (e) by varying the operative load on a particular size furnace; (f) by the introduction of additional air, oxygen, steam, or other oxidizing gas."

"The single characteristic of the process that appears capable of emphasis as responsible for the properties of the product claimed is the *high velocity and turbulence of the gases in the retort.* No critical range is given. In the method as described the combustion mixture of air and gas was fed into retort, of 7″ inside diameter and 16″ length, at a rate of 8800 cu. ft. per hr. The 'make' gas, i. e. the hydrocarbon gas to be decomposed, was fed in at a rate of 1000 cu. ft. per hr." (Italics ours)

In the specification of the method patent of Brownlee, No. 1,909,163, his method is described as follows (the numerals identifying features being omitted as indicated by asterisks):

"As shown in the exemplary drawing, I may use a furnace * * * having a refractory lining * * * and an insulating shell * * *. Disposed part way of the height of the furnace is a checkerwork structure * * * of relatively slight vertical extent, and arranged to be heated by gas burners * * *, which introduce a combustible mixture of gas and air into the furnace. Desirably these burners are arranged with a slight downward inclination to project the combustible mixture against the upper side of the checkerwork, and are so arranged that the streams of combustible mixture have a generally tangential direction. Such positioning of the burners produces a *swirling movement of the combustible mixture and flame* around, and upon the upper surface of, the checkerwork." (Italics ours)

Both the Primary Examiner and the board were of the opinion that Brownlee's patented product, Patent No. 1,920,352, would inherently possess the same properties as those embraced in the product defined in appellants' claims because of the similarity of the process of appellants to that of Brownlee, Patent No. 1,909,163.

In substance, there were the same holdings below with respect to the Reed patent, which is for a process of producing carbon black "by the incomplete combustion of hydrocarbons * * *." It teaches that "by introducing the hydrocarbons *into the furnace at much higher velocities than those of the oxidizing agent so as to insure turbulent flow"* (emphasis supplied) there is produced "an extremely hard and fine carbon black * * * equal to channel black in practically all respects."

Up to this point, we have recited only the rejection based upon a comparison of appellants' method, as described by the examiner, and the methods of (1) Brownlee and (2) Reed.

It is obvious that, notwithstanding the fact that all three of the claims on appeal are product claims. It has been necessary to a decision of the case to study with much care the process of appellants as defined by the Primary Examiner (their process patent not having been included in the record) and compare it with the process defined in the prior art references hereinbefore specified, and this we have done.

Upon the basis of the comparison so made we are unable to find any reason for disagreeing with the holding that, upon the phase here pertinent, both the method taught in the Brownlee patent, 1,909,163,

and that taught in the Reed patent (both reciting the use of a furnace) are substantial equivalents of the process of appellants. The Reed patent seems to us to be particularly apposite on the specific point of introducing the hydrocarbons at a high velocity, thereby insuring a turbulent flow.

At this point, we deem it proper to say that appellants have not challenged the findings of similarity between appellants' process on the one hand and the respective processes of Brownlee and Reed on the other hand, except by asserting that the "particle size," or "surface area," of appellants' product (as finally limited in the claims after appellants' appeal to the board) differs from the surface areas shown by Brownlee and Reed, and from this alleged difference it is argued, in effect, that there must be a difference in the processes. Their brief asserts:

" * * * The fact that a patent was granted for applicants' process is persuasive evidence that applicants' process is substantially different from the processes of the prior art patents. Comparison of the two processes to establish that fact should not be necessary."

The situation presented here is somewhat unusual and not free from perplexity, because its determination is dependent to such a great extent upon inferences rather than upon definitely established facts.

In the course of its decision the board said:

"We sustain this [the examiner's] rejection of claims 19, 20 and 21 as lacking invention over the patents to Reed, and Brownlee No. 1,920,352. We concur with the Examiner's holding that the carbon blacks of these references would have a fixed carbon content of at least 97% and being furnace blacks would be neutral or alkaline in reaction.

"We find the patent to Reed describes the carbon black produced as being equal to channel black in all respects, and as such would have the oil absorption, tinting strength and tensile strength set out in the claims on appeal. The other properties claimed and not specifically disclosed in this patent we believe are inherently present in this reference and would be more or less of the same order as that being claimed.

"We find the patent to Brownlee No. 1,920,352 has a disclosure of the carbon black properties being claimed either through its description of the properties therein or by means of its inherent properties which would be more or less of the same order as that claimed."

It is obvious that the foregoing conclusions of the board depend in the main upon inferences as to inherency, largely growing out of a comparison of processes.

We think it must be said that the inferences are logical and proper, and we can find no reasonable ground for disagreement with them.

Just here seems an appropriate place to take note of the following appearing in the board's decision:

"We sustain the rejection of claim 19 *of* [on?] the patent to Spears et al., on the ground that the difference in particle size of the carbon black of this patent from that of appellants' product amounts to only a difference in degree and not invention. The other properties called for in this claim are present in the patent."

In the brief for appellants, supporting allegations of error on this point stated in the reasons of appeal, this holding by the board is attacked with much vigor. It is pointed out that the specification of appellants describes the carbon black of the Spear et al. patent as having a surface area of only 4.13 acres per pound, and it is disputed that the examiner rejected the claim on Spear et al.

It is a fact that the examiner did not refer to the Spear et al. patent in his supplemental statement made after the case had been remanded to him and the claims had been amended so that they were limited to "a surface area within the range extending from 7.5 to 10 acres per pound."

(Incidentally it may be said that prior to the amendment, the reading seems to have been "a surface area within the range of *about* 7.5 to 10 acres per pound." (Italics supplied) So, the claims were rendered

definite in that respect simply by cancelling the word "about.")

· The examiner's comment upon this amendment was:

"* * * It has the effect of excluding acetylene black from the range of particle size claimed in so far as published information as to particle size of acetylene black is available. The difference now stated is about 3% greater than the highest figure given for acetylene black. It is submitted that the claims in this particular can not be said to differ in more than degree. This appears to be the sole contendable difference over acetylene black and other art in regard to claim 19."

While, as has been stated, no reference was made to the Spear et al. patent in the examiner's supplemental statement, it was referred to in his original statement where he said *inter alia:*

"* * * It appears from the Spear disclosure that impingement [which is the same as channel] black may differ widely in particle size, figures of 61 millimicrons for rubber grade and 25 millimicrons for pigment grade being given. These figures would give acres per pound values below and above respectively the range stated in the present claims. * * *"

In his brief before us the Solicitor for the Patent Office says:

"* * * Presumably, it was upon the basis of that statement that the Board undertook to enter its own, independent rejection of claim 19."

The suggestion of the solicitor may or may not be correct, but, in any event, we need use no further space in discussing the question. Even upon the assumption that the board erred in the phraseology used, it did not constitute reversible error.

It may not be overlooked that claim 19 was rejected not only singly, but also along with claims 20 and 21, the rejection of all three being based upon the Brownlee, Reed and Keller patents. We are not convinced that such rejection was erroneous.

In our consideration of the case we have not failed to give much thought to the contention on behalf of appellants that the particle size of their carbon black differs from the sizes of the carbon black of the references. This contention seems to us, in view of the record, to require an entrance into the speculative field and a drawing of an inference without any sound or sufficient basis for the support of such inference.

Appellants concede (see quotation from their brief in the early part of this opinion) that "it is not possible to go as far as might be desired in defining a new carbon black by its physical properties alone," and hence they say, "Beyond that, one must resort, for purposes of definition, to the *results* flowing from the use of the new black, such as the properties of a rubber product made with the black." (Italics quoted)

We are not prepared to accept this as sound law and we do not think it is supported by the Supreme Court decision—General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 — cited by appellants. That decision seems to us to be directly to the contrary.

But even if we be in error in that respect, the fact remains that, as obviously found by both tribunals of the Patent Office, whatever difference from the prior art exists in the claims on appeal is no more than a difference of degree.

As we view it, there is nothing in the record, nor is there any reasoning extraneous the record, which would justify reversal of the board, and its decision is therefore affirmed.

Affirmed.