51 CCPA
**Application of Glenn T. SEABORG.**
**Patent Appeal No. 7061.**

United States Court of Customs
and Patent Appeals.
March 19, 1964.

---

Roland A. Anderson, John A. Horan, for appellant.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

The application [1] and the claims in issue relate to a new transuranic element having atomic number 95,[2] now known as Americium (Am), to isotopes thereof, and to methods of producing and purifying said element and compositions thereof. Two isotopes of Americium are disclosed, Americium 241 and 242. Two general methods of synthesizing element 95 are set forth, namely (1) bombardment of plutonium with deuterons or neutrons; and (2) in a neutronic reactor operated at a relatively high power level (about 200 kw) for an extended period of time (approximately 100 days). A suitable reactor is said to be that described in Fermi et al. application Serial No. 568,904, filed December 19, 1944, which is now U. S. Patent No. 2,708,656.

The claims in issue read simply:

1. Element 95.

2. The isotope of element 95 having the mass number 241. There is but a single ground of rejection involving the above claims, i. e., unpatentability over the Fermi et al. patent, for the reason that element 95 must be inherently produced in the operation of the reactor disclosed therein.

The Fermi et al. patent discloses several nuclear reactors. The patent does not mention elements 95 and 96. The claims in issue were first rejected on the Fermi patent in the examiner's letter of May 25, 1955. The specific basis for the examiner's rejection on Fermi was the exemplary statement of reactor operation contained in the patent, namely:

"After operation of the reactor for a sufficient length of time for an amount of $94^{239}$ to be created sufficient for chemical separation, such as, for example, 100 days at 500 kilowatts, the reactor is shut down by inserting the control rod fully into the reactor. After about one-half hour's wait, during which all delayed neutron emission will have ceased and the more highly radioactive materials decayed sufficiently, the reactor may be unloaded.

\* \* \*

1. Appellant's application involved in this appeal is Serial No. 692,730, filed August 23, 1946, entitled "Composition of Matter and Preparation Thereof." Several process claims were allowed by the Patent Office.

2. As appellant states in his specification, "The expression 'element 95' is used throughout this description to designate the element having atomic number 95."

" * * * After 100 days' operation the aging period may be about 30 days."

Appellant, however, asserts in his brief:

" * * * The statements are exemplary only. If, however, the statements are accepted on the basis of the Smyth Report as factual, the maximum amount of americium 241 that could have been produced in the reactor operated for 100 days at 500 kilowatts power can be calculated to be $6.15 \times 10^{-9}$ gram. Thus the reactor could have produced no more than one billionth [sic] [3] of a gram of americium-241, and this one billionth of a gram would have been distributed throughout forty tons of intensely radioactive uranium reactor fuel. This amount of an unknown, unconcentrated isotope, if present, would have been undetectable. * * * "

The solicitor has taken no issue with appellant's assertion that the Fermi reactor in the exemplary operation relied on by the examiner "could have produced no more than one billionth of a gram of americium-241, and this one billionth of a gram would have been distributed throughout forty tons of intensely radioactive uranium reactor fuel." In fact, the solicitor states in his brief:

" * * * The facts are relatively simple and not actually in dispute. The rejection is not based upon a finding that the patent expressly discloses the formation of the claimed element, but rather upon the conclusion reached that that product is inherently produced in the operation of the Fermi reactor. This conclusion is based upon a comparison of the method disclosed in appellant's application for producing the product with the method of operation described in the patent. Such comparison has been sanctioned by

this Court in In re Wiegand et al 37 CCPA 1101, 182 F.2d 633."

The position of the Patent Office is further stated in the solicitor's brief as follows:

" * * * Since the products produced in a neutronic reactor depend upon the manner of operation, and appellant does not and cannot really challenge the findings of similarity between appellant's process and Fermi's process, the inference that the claimed product is inherently produced is reasonable and logical. That finding merits this Court's approval, as in In re Wiegand et al, supra."

The issue here arises by application of what both the appellant and the solicitor term the "inherency doctrine," which, as we understand it, is a Patent Office doctrine which infers a lack of novelty in a product under 35 U.S.C. § 101 if a comparable process for making the product is found to exist in the art. When so stated and applied to the facts here this doctrine establishes a broader basis for refusing a patent than is required by the courts in finding anticipation of an issued patent. It goes beyond the rule as stated by Judge Learned Hand in Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2d Cir. 1942):

"No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation."

---

3. It would appear that appellant meant "one one-hundred millionth" rather than "one billionth," since $6.15 \times 10^{-9}$ gram amounts to more than *six* billionths of a gram.

The "inherency doctrine" we are here urged to apply appears to have been extrapolated by the Patent Office from language found in the Wiegand case. Whatever validity the general language used may have had in the field of carbon black production, its validity is much more doubtful when applied as it has been in the present case. The Wiegand case involved claims to a furnace carbon black as a product. They were rejected on references showing the production of carbon black by furnace processes and on a prior product patent covering the furnace carbon black produced by one of the furnaces. This court affirmed the action of the board and summarized the position of the examiner and the board in the following language (37 C.C.P.A. at 1105, 182 F.2d at 636):

> "Both the Primary Examiner and the board were of the opinion that Brownlee's patented product, Patent No. 1,920,352, would inherently possess the same properties as those embraced in the product defined in appellants' claims because of the similarity of the process of appellants to that of Brownlee, Patent No. 1,909,163."

The court recognized the difficulties in such cases and stated (37 C.C.P.A. 1106, 182 F.2d 637):

> "The situation presented here is somewhat unusual and not free from perplexity, because its determination is dependent to such a great extent upon inferences rather than upon definitely established facts."

In concluding its opinion we think the court stated the problem in the Wiegand case as being based, at least in good part, on the indefinite nature of the claimed distinctions, i. e., the particle size of the carbon black. Thus the court stated (37 C.C.P.A. 1108, 182 F.2d 638):

> "Appellants concede * * * that 'it is not possible to go as far as might be desired in defining a new carbon black by its physical properties alone,' and hence they say, 'Beyond that, one must resort, for purposes of definition, to the *results* flowing from the use of the new black, such as the properties of a rubber product made with the black.' * * *
>
> "We are not prepared to accept this as sound law and we do not think it is supported by the Supreme Court decision—General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402—cited by appellants. That decision seems to us to be directly to the contrary.[4]
>
> "But even if we be in error in that respect, the fact remains that, as obviously found by both tribunals of the Patent Office, whatever difference from the prior art exists in the claims on appeal is no more than ·a difference of degree.
>
> "As we view it, there is nothing in the record, nor is there any reasoning extraneous the record, which would justify reversal of the board, and its decision is therefore *affirmed.*"

We therefore find nothing in the Wiegand case which warrants the extrapolation of a "doctrine of inherency" and its application to the claims on appeal. The record before us unlike the record in the Wiegand case, is replete with showings that the claimed product, if it

---

4. The Supreme Court, in United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 237, 63 S.Ct. 165, 170, 87 L.Ed. 232 (1942), a case which also involved the carbon black art, had this to say with respect to the problem of indefiniteness:

" * * * Whether the vagueness of the claim has its source in the language employed or in the somewhat indeterminate character of the advance claimed to have been made in the art is not ma-terial. An invention must be capable of accurate definition, and it must be accurately defined, to be patentable. Cf. General Electric Co. v. Wabash Corp., supra, 304 U.S. at 372, 373, 58 S.Ct. at 903, 82 L.Ed. 1402."

We are convinced, although it was not stated in so many words, that this was the principal difficulty which the court in Wiegand found with the subject matter there claimed.

was produced in the Fermi process, was produced in such minuscule amounts and under such conditions that its presence was undetectable. There was no question in the Wiegand case but that carbon black had been produced by the furnace process of the prior art as shown by the Brownlee carbon black product patent, and the problem there presented seems to us to come down to whether or not the appealed claims defined over that product or the products inherently produced in the prior art process.

In the companion appeal, PA 7060, the board in reviewing the affidavits which had been submitted under Rule 131 to antedate the Fermi reference stated what we consider to be the fact here, that:

" * * * The exhibits submitted, considered in the most favorable light, do not show that appellant could predict with any degree of definiteness the properties or characteristics of the new elements or specify with any certainty the exact procedures which could be followed, without the exercise of more than the ordinary skill of the art, to prepare these elements. Indeed, in view of the unpredictability both as to the character of the product elements and of the processes by which they might be achieved, it is particularly reasonable to hold, as the court did in Smith v. Bousquet, 27 CCPA 1136, 1940 C.D. 474, 519 O.G. 800, 111 F.(2d) 157, that conception and reduction to practice are necessarily concurrent for an invention of this kind. * * * "

We also agree with the summary statement in appellant's brief that:

" * * * There is no positive evidence that americium was produced inherently in the natural uranium fuel by the operation of the reactor for the times and at the intensity mentioned in the exemplary statement relied upon by the Patent Office. The calculations, however, that the maximum amount of americium-241 which could have been produced by the operation of the re-

actor disclosed in the Fermi Patent for 100 days at 500 kilowatts would have been one billionth of one gram (1/1,000,000,000 gram), show that the element, if produced, was produced in the most minute quantities. If the one billionth of a gram were produced, it would have been completely undetectable, since it would have been diluted with the 40 tons of intensely radioactive uranium fuel which made up the reactor. The possibility that although a minute amount of americium may have been produced in the Fermi reactor, it was not identified (nor could it have been identified) would preclude the application of the Fermi patent as a reference to anticipate the present invention."

Since we reject the position of the board in affirming the rejection on the Fermi patent, there is no reason to here consider the sufficiency of the Rule 131 affidavits as establishing for appellant a date of invention prior to the date of the Fermi reference.

For the foregoing reasons, the decision of the board is reversed.

Reversed.